UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALEXANDER J. DUMAS *et al.*,
    *Plaintiffs,*

v.

USAA GENERAL INDEMNITY CO.,
    *Defendant.*

No. 3:17-cv-01083(JAM)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Alexander J. Dumas and Margaret A. Dumas have filed this lawsuit against their home insurance company, USAA General Indemnity Company (USAA). Plaintiffs dispute the company's failure to pay for damage to the foundation of their home caused by cracking and deteriorating concrete. Their claim is one of many such "crumbling foundation" claims that have been filed in this Court by homeowners in Connecticut. Although I regret that plaintiffs must live under a shadow of uncertainty about the stability and value of their home, I conclude that they have not established grounds for coverage under their insurance policy. Accordingly, I will grant defendant's motion for summary judgment.

### BACKGROUND

Plaintiffs Alexander and Margaret Dumas bought their house in Bolton, Connecticut in 1990. Doc. #42-1 at 1. They were the first owners. Before purchasing the house, Mr. Dumas noted small cracks on the first floor of the northwest corner. He and his wife commissioned a home inspection report in connection with their purchase. The report noted cracks in the basement walls, among other issues. The inspectors instructed plaintiffs to watch the cracks and pay immediate attention if they grew. *Id.* at 2.

In 2010, plaintiffs purchased homeowners' insurance from USAA. Although plaintiffs did not report the cracking concrete problem to USAA until 2015, they admit that they noticed a problem at least by 2011. During the spring and summer of 2012, Mr. Dumas tried repairing some of the cracks on his own. He noticed the patched cracks worsening within six months. Doc. #42-1 at 2.

At his deposition, Mr. Dumas was asked why he did not call the insurance company in 2012, when he was concerned enough about the cracks to try to repair them on his own. He stated, "I honestly don't know. I guess I was just a bit in denial about it." *Id.* at 3; Doc. #36-2 at 20.

What prompted him to contact the insurance company was a visit from his neighbor, who had come to help him brainstorm ideas for basement renovations and suggested that he should deal with the crumbling concrete problem before attempting to renovate. Doc. #36-2 at 16. When asked at his deposition if it surprised him when his neighbor said the cracks were a problem, Mr. Dumas responded, "sort of, yes it did," and elaborated that, though he had been monitoring the cracks since 2012, "I guess I was denying it. You know, I guess I didn't want to hear that." *Ibid.*

Plaintiffs filed a claim with USAA on or about June 25, 2015. Doc. #42-1 at 3. An engineer hired by USAA inspected the house a month later. He issued a report stating that the cracking arose in part from defective concrete, that the problem was already present when plaintiffs bought the home, and that the resulting damage had occurred over time. *Ibid.*

Plaintiffs hired their own expert who opined that the cracking was caused in part by high levels of pyrrhotite in the concrete, which causes swelling and cracking when exposed to oxygen and water. Doc. #42-3 at 2-3. He said that a house with pyrrhotite will eventually collapse, although he could not say that would happen in less than 25 years, and that the concrete would

need to be replaced in two to three years. *Ibid.*; Doc. #42-1 at 6, 10; Doc. #36-9 at 45-46, 106. He also said that the damage to the house had not occurred suddenly (with "sudden" defined by him as "a break that happens almost immediately") and that there had been no "falling-in" or "caving-in" of the foundation walls or the house as a whole or an imminent peril that the walls or house would do so. Doc. #42-1 at 6; Doc. #36-9 at 103-104.

Plaintiffs continue living in their house. At his deposition, Mr. Dumas testified that he would characterize the problem as a gradual condition that has gotten progressively worse over time. He said he has noticed the cracks getting bigger since he started paying attention to them in 2012, and that the basement walls are "slowly crumbling; they are slowly falling apart." Doc. #42-1 at 4; Doc. #36-2 at 21. Plaintiffs allege that it will cost $193,320 to fix their property. Doc. #42-1 at 10.

USAA denied coverage on August 18, 2015. Plaintiffs followed with this lawsuit alleging claims for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Connecticut Unfair Trade Practices Act (CUTPA) and the Connecticut Unfair Insurance Practices Act (CUIPA). USAA now moves for summary judgment. Docs. #35, #36.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve

3

close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

### *Count One - breach of contract*

Plaintiffs allege that defendant has breached the terms of the insurance policy by declining coverage. A court must interpret the terms of an insurance policy as it would a contract to determine if the text of the policy makes the parties' intent unambiguously clear. Only if the text of the policy is ambiguous does a court look to other evidence of the parties' intent and in light of the rule that any ambiguity or exclusion in the policy must be construed in favor of the insured. *See, e.g.*, *Conn. Ins. Guar. Ass'n v. Drown*, 314 Conn. 161, 187-88 (2014).

### *Collapse*

Plaintiffs contend that their loss is covered under multiple provisions of their policy. First and foremost, they argue that they have experienced a "collapse." But their policy expressly defines collapse as "a sudden falling or caving in" or "a sudden breaking apart or deformation such that the building or part of a building is in imminent peril of falling or caving in and is not fit for its intended use." Doc. #36-6 at 34.[1] The deposition of plaintiffs and their expert make clear that the damage was not sudden and in fact occurred gradually over time. This is fatal to

---

[1] While the policy underwent a series of revisions during the coverage period, the parties agree that the policy in relevant part provides coverage for collapse, defined as "a sudden falling or caving in" or "a sudden breaking apart or deformation such that the building or part of a building is in imminent peril of falling or caving in and is not fit for its intended use." Doc. #36-6 at 34 (defining "collapse"). Additionally, collapse is covered only if it is caused by one of six listed factors, including, among others, "decay that is hidden from view," and "use of defective materials or methods in construction, remodeling, or renovation." *See* Doc. #36-6 at 47 (policy generally covers "direct, physical loss to tangible property described in PROPERTY WE COVER . . . unless excluded in LOSSES WE DO NOT COVER,"), 51 (section titled LOSSES WE DO NOT COVER excludes coverage for collapse, "other than as provided in ADDITIONAL COVERAGES, 'collapse'"), 43 (collapse provision in ADDITIONAL COVERAGES section). The collapse provision of the policy clarifies that "[d]amage consisting solely of settling, cracking, shrinking, bulging or expansion is not covered by this additional insurance unless it is the direct result of 'collapse.'" *Id.* at 34.

4

their claim. The word "sudden" means abrupt, not gradual. *See Valls v. Allstate Ins. Co.*, 919 F.3d 739, 744-45 (2d Cir. 2019) (*per curiam*); *see also Huschle v. Allstate Ins. Co.,* 2019 WL 1427143, at *3 (D. Conn. 2019).

Plaintiffs insist that, whether or not the loss was sudden, the foundation of their home has been substantially impaired. This may be true, but it is not the relevant inquiry given the precise terms of their policy. In cases where a policy does *not* define collapse, Connecticut courts interpret the term to mean a substantial impairment to the structural integrity of the home. *See id.* at *3 (citing *Beach v. Middlesex Mut. Assur. Co.,* 205 Conn. 246, 249 (1987)). By contrast, where, as here, the policy expressly defines the term "collapse," then the terms of the policy control. *Ibid.*

### *Chemical reaction*

Plaintiffs next argue that the chemical reaction occurring in the concrete is itself a sudden and direct physical loss, and that the cracking concrete is just a further manifestation of that loss. Doc. #42 at 5. They argue that the damage to their property is therefore covered, because "the policy does not exclude chemical reactions." *Ibid.* But as Judge Shea has observed in rejecting a similar argument, "the terms 'direct physical loss' and 'loss,' as used in the [policy], unambiguously require some change to the detriment of the insured, and a chemical reaction— without any physical manifestations—does not fit that bill." *England v. Amica Mut. Ins. Co.,* 2017 WL 3996394, at *6 (D. Conn. 2017) (analyzing substantially similar policy provisions, along with the ordinary meaning of "loss" and its use in Connecticut law).

The policy's exclusions use the term "loss" to describe something that is the *result* of various underlying processes or events, not the cause. The section titled "LOSSES WE DO NOT COVER" describes how the policy does not cover "damage consisting of or caused directly or

5

indirectly by" enumerated causes that "produce the loss." Doc. #36-6 at 50. The same section provides that "2. We do not insure for loss caused by any of the following . . . (c) faulty, negligent, inadequate or defective . . . (3) materials used in repair, construction, renovation, remodeling, or maintenance." *Id.* at 51. And the "Suit Against Us" provision states that "[n]o action can be brought against us unless you have . . . started the action within two years after the date of the loss." *Id.* at 56.

The language of these provisions "suggests that the term 'loss' must be accorded a meaning that is limited to observable, tangible effects: if the term 'loss' were interpreted to include the occurrence of an imperceptible chemical process, before that process were to result in any observable effect, no policyholder could determine a date of loss for the purpose of establishing the timeliness of the policyholder's suit." *England*, 2017 WL 3996394, at *7; *see also Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, 287 F. Supp. 3d 153, 161 (D. Conn. 2017) (concluding that "the chemical reaction is a process that can *cause* tangible, physical property damage; it does not qualify as a compensable *loss* in and of itself.") (emphasis in original).

To the extent that plaintiffs mean to argue that the effects of a chemical reaction is covered under the collapse provision of the policy, the policy language makes clear that the policy excludes coverage for cracking that predates a collapse. Cracking is only covered if it is *caused by* (not the *cause of*) a collapse. Doc. #36-6 at 34 ("Damage consisting solely of settling, cracking, shrinking, bulging or expansion is not covered by this additional insurance unless it is the direct result of 'collapse.'"). This "cracking" exclusion would be wholly superfluous if a policy holder could circumvent it by claiming that there is coverage for a chemical reaction that causes cracking in foundation or basement walls even when there has been no collapse. *See*

*Lester v. Liberty Mut. Fire Ins. Co.*, 325 F. Supp. 3d 243, 248 (D. Conn. 2018) (holding for similar reasons that chemical reaction is not covered under a "risk of loss" provision).

### *Ensuing loss provision*

Plaintiffs next argue that they are covered under the so-called "ensuing loss" provision of the policy. The provision provides in relevant part that "[a]ny ensuing loss to property described in Dwelling Protection and Other Structures Protection not precluded by any other provision in this policy is covered." Doc. #36-6 at 51. This text makes clear that an "ensuing loss" does not negate an otherwise applicable exclusion under the policy; it allows for coverage only if an exclusion or exception does *not* apply. *See generally Mazzarella v. Amica Mut. Ins. Co.*, 2018 WL 780217, at *6 (D. Conn. 2018) (describing function of an "ensuing loss" provision as allowing for coverage of a loss that is "separate and independent" from an exclusion but cautioning that "[w]here a property insurance policy contains an exclusion with an exception for ensuing loss, courts have sought to assure that the exception does not supersede the exclusion by disallowing coverage for ensuing loss directly related to the original excluded risk") (internal citations and quotation marks omitted). Because plaintiffs do not identify any grounds for loss that are separate and independent from the exclusions that apply in this case, they are not entitled to coverage under the "ensuing loss" provision of the policy. *See Lester,* 325 F. Supp. 3d at 248 (rejecting same argument on same grounds).

### *Reasonable repairs provision*

Plaintiffs further argue that their loss is covered under the "reasonable repairs" provision of the policy. This provision states: "In the event that covered property is damaged by an applicable loss under Section I – LOSSES WE COVER, we will pay the reasonable expense incurred by you, for necessary measures taken solely to protect against further damage."

7

Doc. #36-6 at 40. But as the text of this provision makes clear, it applies only if there is a peril for which there is coverage in the first instance. Plaintiffs have not shown an initial covered loss. Accordingly, they are not entitled to payment for reasonable repairs that they might make to their house. *See Lester*, 325 F. Supp. 3d at 248-49 (rejecting same argument).

### *Counts Two and Three - covenant of good faith and CUTPA/CUIPA*

Because plaintiffs have not alleged plausible grounds to conclude that the defendant breached the insurance contract, there are no grounds for plaintiffs' additional claims for breach of the duty of good faith and fair dealing or for plaintiffs' statutory CUIPA and CUTPA claims as alleged in Counts Two and Three of the complaint. *See Valls*, 919 F.3d at 745 & n.25; *Kowalyshyn v. Excelsior Ins. Co.*, 2018 WL 888724, at *7 (D. Conn. 2018).

### CONCLUSION

For the reasons set forth above, the Court GRANTS defendant's motions for summary judgment (Docs. #35, #36). Defendant's *motion in limine* (Doc. #47) is DENIED as moot. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 6th day of August 2019.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge